**ORIGINAL**

# SEALED

U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2022 OCT -7  AM II: 24

DEPUTY CLERK_____ _mlb_

| | |
|---|---|
| Jason Hamm ex rel. UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF GEORGIA, THE STATE OF ILLINOIS, THE STATE OF MICHIGAN, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF WISCONSIN, THE COMMONWEALTH OF VIRGINIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF IOWA, and THE STATE WASHINGTON, and individually<br><br>Plaintiffs,<br><br>v.<br><br>Agendia, Inc., aka Agendia Medical<br><br>Defendant | § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. _____<br><br>**3-22 CV 2259 -E**<br><br>FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §3729 ET SEQ. |

## QUI TAM COMPLAINT

Plaintiff and Relator herein Jason Hamm ("Relator") hereby files this Qui

Tam complaint on behalf of the United States of America against Agendia, Inc.

("Agendia") pursuant to the False Claims Act, 31 U.S.C. §3729 et seq. ("FCA") and

the state government entities "(State Plaintiffs") under the individual false claims

acts identified herein as well as individually under § 3730(h) of the FCA and Texas

common law. As required, Relator has provided one or more Disclosure Statements

in accordance with §3730(e)(4)(B) and § 3730(b)(2) of the federal False Claims Act

-1-

("FCA") and the relevant provisions of State Plaintiffs' individual False Claims Acts ("state FCAs") identified herein. The footnotes contained herein should be read and considered as part of the allegations set forth in this Qui Tam Complaint.

I.    Summary of Claim

A.    Background and Overview

1.    Agendia is a privately held, molecular diagnostics company that develops and markets *formalin-fixed paraffin-embedded* ("FFPE")-based genomic diagnostic products, which can support physicians with complex treatment decisions involving breast cancer treatment.

2.    Agendia uses genomic testing to generate clinical data about the biology of a woman's breast cancer. Agendia's National Provider Identification ("NPI") is 1821253584 and was assigned in July 2008. Agendia's taxonomy code is 291U00000X. Agendia is registered through NPI as an organization and its NPI record was last updated seven years ago. The authorized official of its NPI record is Dr. Jennifer Jia-perng Wei Md., Phd ("Medical Director"). The CLIA ("Clinical Laboratory Improvement Amendments") number of Agendia is 05D1089250, and it registered as an "independent" facility with a CLIA Certificate of Accreditation. The CLIA certificate issued to Agendia was issued by an accreditation organization approved by Center for Medicare & Medicaid Services ("CMS"). CMS regulates all laboratory testing (except research) performed on humans in the United States.

3.    Agendia's testing products include the FDA-cleared MammaPrint FFPE 70-gene breast cancer recurrence assay (i.e., to address the question what are

the chances cancer returns?) and BluePrint®, a molecular sub-typing assay (i.e., what type of cancer is it). Both, properly used, can provide more clinically actionable breast cancer biology then without using them.

4.     When performed at the appropriate time and with the requisite qualifying conditions present, these tests can assist physicians assess a patient's individual risk for metastasis.  They can also assist in the the decision which patients are more sensitive to chemotherapy, hormonal, or combination therapy, which patients may not require these treatments, and which patients may be treated with other, less arduous and costly methods.

5.     Relator began employment with Agendia in 2013 as a molecular oncology specialist. From 2015 through 2020, Relator held the post of Regional Sales Director covering the states of Texas, New Mexico, Oklahoma, Arkansas, Missouri, Kentucky, Tennessee, Alabama, Florida, Georgia, Mississippi and Louisiana. Thereafter, he became vice president of Strategic Accounts and Market Development. In December 2021, Relator was named Vice President of North America Sales for Agendia until his abrupt termination in August 2022. On December 20, 2021, Plaintiff entered into an employment agreement with Defendant specifying terms of his employment as its Vice President of North America Sales as of and after that date.

6.     Relator believes, based on his observations and personal knowledge, that unlawful practices described in this Qui Tam Complaint are occurring system-wide (nation-wide) at Agendia and have been ongoing for several years despite his attempts to stop such practices. First, these unlawful practices include Agendia performing genomic testing using its MammaPrint and Blue Print products with only a positive core biopsy occurrence, but before all of the results of a pathology report which identifies the presence, or absence, of the other necessary qualifiers for such testing, such as receptors, tumor markers, size and grade of the tumor and nodal status. This renders the tests medically unnecessary (and therefore not properly reimbursable). Second, these unlawful practices violate the Federal Anti-Kickback Statute by offering unlawful inducements (described herein) to health care providers to order Agendia's tests, both when the testing is medically necessary and when it is unnecessary.

7.     Agendia, in submitting claims to Federal and State payers (identified collectively, "Government Payers") has knowingly and falsely expressly certified (and continues to certify) that its diagnostics testing services satisfied all conditions for payment and are medically necessary and reasonable. This express certification is material to the Government Payers' decisions to reimburse and pay for such tests.

8.     In addition to the above, Agendia, in submitting claims to Federal payers, has knowingly and falsely expressly certified (and continues to certify) that it has have not violated the Federal Anti-Kickback Statute and related anti-kickback statutes in the respective states identified herein. This express

-4-

certification is material to the Government Payers' decision to reimburse and pay for such tests.

B.    What is Genomic Testing

9.    While their names sound similar, genetic testing and breast cancer genomic testing are very different. Genetic testing determines if an individual inherited a broken gene that may cause him or her to develop certain types of cancers in their lifetime. Genomic testing affords a deeper look into genetic characteristics of an individual cancer cell to determine the best cancer therapy. Genomic tests, also called tumor genomic assays, analyze a cancer to see how active certain genes are. Different genomic tests analyze different sets of genes. The activity level of these genes affects the behavior of the cancer, including how likely it is to grow and come back after treatment.

10.    Genomic tests are used to help make decisions about whether treatments after surgery, such as chemotherapy, would be beneficial.

C.    The MammaPrint Test

11.    MammaPrint is carried out on breast cancer tumor tissue that is fixated in formalin. After a breast cancer tissue diagnosis is confirmed by a histopathology laboratory, tumor tissue is then sent off to an approved genomic laboratory for MammaPrint testing. The MammaPrint result is indicated for use by physicians as a prognostic marker only, along with other clinical-pathological factors. MammaPrint is not intended for diagnosis, or to predict or detect response to therapy, or to help select the optimal therapy for patients.

12. MammaPrint ("MP") is a tumor profiling test. MammaPrint tests a sample of the tumor (removed during a biopsy or surgery) for a group of 70 genes.

13. MammaPrint is a test that helps show whether some estrogen receptor-positive ("ER-positive"), human epidural grown factor receptors2 ("HER2") negative breast cancers are likely to metastasize (spread to other organs). The result of a MammaPrint indicates whether there is either a low risk of a metastasis ('a good prognosis') or a high risk of a metastasis ('a bad prognosis').

14. If the MammaPrint results show a fairly low risk of metastasis, a less aggressive treatment phan that includes only hormone therapy may be advised. If the MammaPrint results show a fairly high risk of metastasis, a more aggressive treatment plan that includes both hormone therapy and chemotherapy may be advised.

D.    The BluePrint Test

15. Estrogen receptors ("ER"), progesterone receptors ("PR") and HHER2 receptors are well-established biomarkers for breast cancer prognosis and for guiding treatment (collectively "ER/PR/HER2"). BluePrint ("BP") is a molecular subtyping assay that identifies HER2 and the full ER/PR/HER2 expression assay. The BluePrint test identifies does so by examining 80 different genes.

16. Using the BluePrint test, a tumor is then accurately classified as one of three subtypes, which reveal valuable information about its behavior, long-term prognosis and response to systemic therapy. MammaPrint and BluePrint tests are collectively referred to herein as "MP/BP Tests."

E.    The Role of the Pathology Report

17.    A pathology report is a medical report about a piece of tissue, blood, or body organ that has been removed from the body. The specimen is analyzed by a pathologist, who then prepares a report. Pathology reports are used by medical providers to determine a diagnosis or treatment plan for a specific health condition or disease. In the case of breast cancer, a pathology report identifies critical markers that will indicate whether MP/BP tests are medically necessary.

18.    In most cases, a pathology report contains the following clinical information, (i) case number used to identify the specimen, (ii) the date and type of procedure by which the specimen was obtained (for instance, a blood sample, surgery, or biopsy), (iii) medical history and current clinical diagnosis, (iv) a detailed description of what the pathologist sees during microscopic exam of the specimen and (v) the final diagnosis, which is the "bottom line" of the testing process.

19.    The pathology report describes important characteristics of any breast cancer and the results of each test that is done. Together, all these reports make up the pathology report. There are two main types of pathology reports, a biopsy pathology report and an excision pathology report with a synoptic summary.

20.    A biopsy pathology report describes what is found in the small sample of tissue removed during the biopsy. An excision report with a synoptic summary describes all the characteristics of the whole cancer.

21.    The parts of a biopsy pathology report and an excision pathology report are very similar, with one important difference: the biopsy pathology report will not

have information about the stage of the cancer. This is because a cancer's stage depends primarily on the size of the cancer. Because a biopsy only removes a small piece of the cancer, its size cannot be determined until the whole cancer is removed by excision.

22.    A pathology report contains the final diagnosis describing the type of cancer and will likely include information about cancer type and grade, hormone receptor status, HER2 status, lymph node involvement and anatomic location (where in the body the cancer is located). These are critical markers, or qualifiers, that will indicate whether MP/BP Tests are medically necessary and reasonable.

F.    Reimbursement for Genomic Testing

23.    To be covered under Medicare Part B, a clinical laboratory test, such as a genetic test, must be ordered by a physician (or a qualified non-physician practitioner) who is treating a beneficiary for a specific medical problem and who uses the results in the management of that problem (42 CFR § 410.32(a)). The test must be related to the beneficiary's illness or injury (or symptom or complaint) (Medicare Claims Processing Manual, Pub. No. 100-04, chapter 16, § 10).

24.    Beneficiaries pay no coinsurance or deductible for Medicare-covered laboratory tests. Medicare pays laboratories for genetic tests based on amounts listed on the Clinical Laboratory Fee Schedule ("CLFS"). To receive Medicare payment for a genetic test, a laboratory submits a claim (42 CFR § 424.5(a)(5)).4.

25.    Providers, such as laboratories, must use the appropriate procedure codes on claim forms for most outpatient services, including genetic tests (Medicare Claims Processing Manual, chapter 23, §§ 20 and 20.3).

26.    Three categories of procedure codes on the CLFS are specific to genetic testing: molecular pathology tests, Multianalyte Assays with Algorithmic Analyses ("MAAAs"), and Genomic Sequencing Procedures ("GSPs").    Medicare payment amounts for these types of genetic testing are based on procedure codes on the CLFS.

27.    CPT 81455 - Targeted genomic sequence analysis panel, when performed, covers 51 or greater genes (e.g., ALK, BRAF, CDKN2A, CEBPA, DNMT3A, EGFR, ERBB2, EZH2, FLT3, IDH1, IDH2, JAK2, KIT, KRAS, MLL, NPM1, NRAS, MET, NOTCH1, PDGFRA, PDGFRB, PGR, PIK3CA, PTEN, RET), and includes interrogation for sequence variants and copy number variants or rearrangements.

28.    Molecular genetic testing is performed for targeted genomic sequencing and/or DNA/RNA analysis of 5-50 genes in patients diagnosed with hematolymphoid neoplasms or disorders, including leukemia, lymphoma and myelodysplastic syndromes (CPT 81450), and of 51 or more genes in patients with solid organ or hematolymphoid neoplasms (CPT 81455).

29.    The wide diversity of cancer at the molecular level requires advanced assessment of genetic markers for classification of cancer by pathways. Identification of the unique genetic makeup of a cancer can lead to targeted therapy

and improved patient outcome. Blood or tissue samples are obtained by a separately reportable procedure. The sample is tested using polymerase chain reaction ("PCR") and next generation sequencing ("NGS") or massively parallel sequencing ("MPS") to evaluate genetic material in totality or near totality for sequence variants, copy number variants, or rearrangements and may include isoform expression of mRNA expression levels.

30.    Genes evaluated using CPT Code 81451 include BRAF, CEBPA, DNMT3A, EZH2, FLT3, IDH1, IDH2, JAK2, KRAS, KIT, MLL, NRAS, NPM1 and NOTCH1. Genes evaluated using CPT code 81455 include ALK, BRAF, CDKN2A, CEBPA, DNMT3A, EGFR, ERBB2, EZH2, FLT3, IDH1, IDH2, JAK2, KRAS, KIT, MLL, NRAS, NPM1, MET, NOTCH1, PDGFRA, PDGFRB, PGR, PIK3CA, PTEN and RET.

## II.    Jurisdiction and Venue

31.    Many of the acts constituting unlawful conduct of Agendia proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred within the Northern District of Texas, and Defendant does business in the Northern District of Texas.

32.    Based on the allegations of paragraph 31, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 as well as pursuant to 28 U.S.C. § 1345. Venue also lies under 31 U.S.C. § 3732.

33.    The allegations which give rise to Relator's Complaint are not taken primarily from disclosures of specific information relating to allegations or transactions from any criminal, civil, or administrative hearing, a congressional,

administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media. Relator is the original source of the information upon which this Qui Tam Complaint is based.

34.    Prior to filing the Complaint, Relator has voluntarily provided the United States with material evidence in one or more Disclosure Statements as part of Relator's obligation to provide the government with material information prior to filing a Complaint in accordance with 31 U.S.C. § 3730(b)(2).

### III.    Agendia's Submission of False Claims

### A.    Agendia's Submission of Medically Unnecessary Claims

35.    MammaPrint and BluePrint can assist in predicting the chance of metastasis for some breast cancers at high clinical risk of recurrence, based on estrogen receptor status, HER2 status, tumor grade, lymph node status and tumor size.

36.    MammaPrint and BluePrint can be considered medically necessary and reasonable for use in high clinical risk breast cancers that meet all of the following markers:

  a.    Tumor size no larger than 5 cm (or if larger, can be removed with surgery).

  b.    Tumor Grade. A tumor grade is a way of classifying tumors based on certain features of their cells. It is highly related to a prognosis and is part of breast cancer staging. Using a microscope, a pathologist studies the tumor tissue removed during a biopsy. Tumor grades are usually classified as Grade 1 - the tumor cells look the most

like normal tissue and are slow-growing (well-differentiated); Grade 2, - the tumor cells fall somewhere in between grade 1 and grade 3 (moderately differentiated) and Grade 3, - the tumor cells look very abnormal and are fast-growing (poorly-differentiated).

c.      Lymph nodal status. Three (3) or less lymph nodes must be involved.

37.      For any given tumor size and breast cancer stage, prognosis is poorer when a tumor grade is higher. The stages of breast cancer range from 0 to IV (0 to 4). The highest stage (stage IV) is any cancer with metastasises (M1), no matter the size of the tumor, the lymph node status or other factors. This is known as metastatic breast cancer and is the most advanced stage of breast cancer.

38.      If the MammaPrint results show a low risk of metastasis, the use of hormone therapy alone may be considered. In this way, MammaPrint may help some people avoid chemotherapy and its side effects. The results of the MammaPrint test help predict the chance of metastasis for some ER-positive, HER2-negative breast cancers.

39.      MammaPrint and BluePrint are only medically necessary and reasonable after a core biopsy is performed, a diagnosis is made by the treating physician and a pathology report is issued identifying the markers described above (tumor grade, size and type as well as lymph node status). Notwithstanding, Agendia has sought referrals and performed its MammaPrint and BluePrint tests before receiving a pathology report.

B.   Agendia's Marketing Schemes Violate the Anti-Kickback Statute

40.   Agendia has systemically pursued a myriad of sales programs, policies and practices that target providers with illegal inducements as a way to gain referrals for its genomic diagnostics tests. These include the following.

1.   The Agendia 10 Program

41.   Agendia 10 Program. In 2015 and 2016, Agendia implemented a sales and marketing program that allowed for each molecular oncology specialist ("MOS" i.e., sales representatives) nationwide to select ten to fifteen accounts that would be provided with ten free tests as a way of "gaining experience" for the targeted physician/provider.  The purpose and intent of this program was to induce referrals.

42.   The specific direction and plan was for the MOS to choose large volume accounts that were almost exclusively breast surgery practices and accounts that had been only ordering a minimal number of the MP/BP Tests at the time.

43.   The intention was that these accounts could be induced through free testing and clinical experience with Agendia's results, to begin order MammaPrint and/or BluePrint tests routinely, instead of using the primary alternative, Oncotype DX testing. Like MP/BP Tests, Oncotype DXR is also a tumor profiling test. The Oncotype DXR is a test that may predict how likely it is that breast cancer will return. It also predicts benefits from having chemotherapy in addition to hormone therapy.

-13-

2.    The FLEX Program

44.    The "FLEX" program, formally known as the Full-genome Data Linked With Clinical Data to Evaluate New Gene EXpression Profiles ("FLEX") program, began in February 2017.

45.    Potential participating sites were targeted and identified by the MOS and the commercial sales team and then vetted by Agendia's clinical team to determine which accounts would be approached to enroll.

46.    Agendia required that the account should be potentially large in volume, have clinical resources, a nationally known clinician onsite and have previously ordered one or more MP/BP Tests in the past.

47.    The FLEX Program had several inducements to the targeted providers which included Agendia only billing third party insurers and ensuring the patients had no "out of pocket" expense. Agendia would not bill the patient, but would incur the loss internally. While there was no deductible from the Government Payers, this inducement, even though the direct benefit was to private insurance patients, was intended to directly and indirectly affect the Government Payers because the program's purpose was to gain access and influence with the provider in order to seek referrals from all patients, including Medicare and Medicaid patients.

48.    The claim processing and billing within the FLEX Program have changed multiple imes and at some point, Agendia began sending patients bills with the caveat that the clinical team would tell the physicians that their patients could "throw the bills away" or they would have the MOS discuss the billing issues to

-14-

"keep a clear line between clinical and commercial." Mark Straley, Agendia's president and chief executive officer, personally oversaw this program in effort to drive more orders and more physicians/accounts to join.

49. Agendia openly took the position that "per our contracts with Medicare and private insurers, they were only required to bill patients, but were not required to collect patient portion." Agendia would also not make any attempts to contact or bill the patient beyond the third attempt if the patients were part of the PCI program, described in paragraph 52.

1. Rapid Results and Pre-Operative Initiative ("PCI") Program

50. The Rapid Results Program began in approximately September 2019. The Rapid Results ("RR"), later known as the Pre-Operative Initiative ("PCI") program, was initiated in an effort to induce referrals, but its purpose also grew to induce providers to move the ordering of genomics testing on "everyone upstream" (i.e., immediately after a positive biopsy). This necessarily meant ordering before the pathology report was available that identified the required qualifiers for reimbursement.

51. Rapid Results was the name of the program initially. Agendia fired Wendy Blosser, its chief commercial officer ("Blosser"), and Joe Flanagan its vice president of strategic accounts and market development ("Flanagan") took over the project, the name of the program was changed to PCI. Blosser created the programs, as this

what "she used at her previous companies." Straley had Agendia run a "pilot" program in 2019 before he would approve it. Blosser and Flanagan were responsible for running and executing the programs.

52.    The essential goal of the RR program was to induce providers to make referrals to Agendia, and make such referrals as early as possible, even before the pathology report was finalized to identify the qualifying markers. To do this, Agendia approached providers under the pretext that it was "free" ordering for a set period of time or until the doctors or accounts became accustomed to results of MP/BP Tests, at which time Agendia would then begin billing the patients once again in accordance with existing contracts.

53.    The marketing strategy was to present the proposal as a "research or a trial" in which the account could use the data collected to "publish" or "present" their data at the major breast cancer conferences throughout the year.

54.    The marketing strategy also included an offer to provide the accounts with "clinical reviews" of their data. Accounts that were not participating in the RR program did not receive the same "clinical reviews." This was another incentive of the program to induce the referrals and ordering of the MP/BP Tests.

55.    In the initial stages of the program, MOS were instructed to state that, because Agendia was not billing the patients, Agendia would be "paying their deductible for them, for the year."

56.    Early on in the RR program, other false pretexts were used to hide the inducements. As an example, some accounts (e.g., University Hospital, Cleveland)

received "free" testing under the guise of "quality projects" as a way to allow the account to gain experiences and dependency with Agendia's testing and results free of charge. Once the dependency was in place, Agendia would return to standard billing processes adhered to with all other accounts. University Hospital, Cleveland initially was to receive 100 free cases but due to the fact that the medical oncologist there had not completely committed to ordering Agendia allowed for the free ordering to go on for the entire year of 2020 and 2021.

57.    In or about June 2020, Agendia's billing policy related to the RR changed at the insistence of Agendia's new chief executive officer, Brian Dow, who had just been hired. Agendia began billing the patients for their portion, but the sales staff was instructed to tell the accounts/doctors that they could inform their patients they were part of a "trial or quality project" and as such they should "throw any and all bills away."

58.    Again, in late 2020 or early 2021, Agendia again made a further shift in billing under the RR program at the insistence of Brian Dow, its chief executive officer, so that the billing was standardized across all orders. This included sending two paper bills to the patient, and then making a third and final collection attempt with a phone call. Once Again, Agendia instructed MOS to inform the doctors that patients would have no financial responsibility. Agendia had a legal requirement to bill the patient but no legal requirement to collect from the patient. If they did not respond to the two bills, there would be no further communication from Agendia." Furthermore, if the physician asked about balance billing, they could inform the

physician that Agendia does not balance bill patients or send patients to collections."

2.    Pathology Retrieval and Transport Agreement Inducements

59.    Rapid Result programs also included the Pathology Specimen Retrieval and Transport Agreement ("RTA") which was a contractual agreement to compensate specific individuals (nurse, physician) the sum of $1,000 per month. The term of the RTA was for one year. Copies, or samples of the RTA, are attached hereto as Exhibits A, B and C. In every case, these purported "services" were already part of the regular duties and scope of work of the individual provider. The $1,000 payment was understood and intended as an inducement for referrals. The individuals receiving the payments were each issued IRS form 1099. A copy of a list of these individuals is attached hereto as Exhibit D.

60.    The practice of using RTAs was built and designed to allow the doctors or accounts to gain "experience" with MP/BP orders and results during a "90-day trial" period (in some cases it would go on for a year or more), at which time Agendia would bill Medicare and private insurance but would not bill the patients for any co-pays, coinsurance or any unpaid portion of the bill based on their insurance.

61.    Initially, the program was almost entirely focused in the Southeast and Florida as Blosser and Flanagan had previously worked in that area and had existing relationships with doctors. Blosser and Flanagan believed that he could convince these people to participate in the RR program based on past

experience. By this time, the program had allegedly been vetted by "[Agendia's] legal" and Straley had approved of the program moving forward as a "pilot" for the fourth quarter of 2019.

62.    By the end of 2019, Flanagan had individually brought on six accounts. In each of these accounts, someone within the practice was being paid to place orders via the 1099 contracts. One of the original accounts was in a territory over which Relator was regional sales director over at the time. Dr. Michael Cross, at Breast Treatment Associates in Fayetteville, Arkansas, was one of the original six "pilot" sites in the fourth quarter of 2019.

63.    Agendia positioned the Rapid Results program as a way to gather clinical information on all patients for a 90-day trial period. This was how the program was designed. It allowed for surgeons to order on all patients under the pretense that it was a trial or only for a short period of time in order to gain some clinical information/experience with the MP/BP Tests on their patients.

64.    The program was positioned such that at the end of the trial period Agendia would provide a clinical review with each practices' patient data as it related to results of their MP/BP Tests results and how that was or was not concordant with their pathology results. The clinical review was the product of Agendia that ultimately was to be used to convince any medical oncologist of the clinical validity of Agendia's results and rationale for continuing to order Agendia tests on ALL early-stage breast patients moving forward.

65.    By the end of 2019, RR program case volume had increased. RR

-19-

Programs then went from six accounts in 2019 to 104 in 2020.  With this increase in RR accounts, the number of orders for MP/BP Tests increased exponentially.  By the close of 2020, Agendia reported at its national sales meeting in January 2021 that the RR program had brought in $14 million in revenue for the year.

66.    Despite the practice of Agendia of using RTAs, during meetings with his team, Relator made it very clear that he and his subordinates were not going to offer any 1099 contracts nor talk about 1099 contracts with any accounts.  The sales approach in his control would be solely based on the clinical data.

67.    Agendia had positioned the RR as a way to boost FLEX enrollment, in which all participating accounts got paid for enrollment. As part of the RR program, Agendia would have the participating physicians sign "Test Request Forms" ("TRFs") which an MOS would make copies of and deliver to the pathology lab or office staff, whichever was ordering the MP/BP Test, for them to use when sending in the order.  A sample copy is attached hereto as Exhibit E.  This was done to allow the office staff who were receiving payment to submit an order on all early-stage breast patients without requiring the physician to sign the order as it was being placed.

68.    Flanagan directed MOS to get the TRF's signed, copied, and delivered to the accounts prior to the start of the RR program. In February 2020, Agendia had West Clinic in Memphis, Tennessee send pathology reports and insurance information to create TRF's for each of the patients they had chosen to order on.

69.    In total, there was 66 PCIs in 2021.  Relator learned that all the outstanding RTF contracts were being terminated immediately and that Agendia decided that it was not going to pay any outstanding or future invoices.  The RR program ended abruptly in March 2021.

3.    First 100

70.    In 2021, a new program, was added at accounts that had already had a PCI in place. This program focused inducing physicians to refer or order tests on all positive cases going back as far as five years to determine if the patient is Ultra Low, Low or High by MP.

71.    Agendia advised MOS and staff that Medicare covered all early stage breast patients, regardless of receptor status.    This was the direction given in regard to Extended Endocrine ordering and a "First 100" program was rolled out at the end of 2021.

72.    Physicians were also told that ordering based only on the core biopsy on every patient was fully compliant, including representing that Medicare coverage permitted ordering on all patients going back five years.

73.    MOS were instructed to make sure the physicians knew of Medicare coverage going back five years and that their patients would not have any out-of-pocket costs because Medicare paid 100%.

74.    Agendia instructed staff and MOS not to direct physicians to only order extended endocrine cases on Medicare patients, but they were told to make sure they knew Medicare would not receive bills and private only insurers would receive

-21-

bills.

75.    In violation of the FCA[1], Agendia knowingly made, or caused to be made, false claims material to the federal Medicare programs identified herein as follows:

1.    Submitting claims for reimbursement for services that were not medically necessary or reasonable.

2.    Falsely and expressly certifying compliance with the Anti-Kickback Act,

### IV.    Federal Regulatory Framework

A.    The Anti-Kickback Statute

76.    The Medicare, Medicaid and Anti-Kickback Act ("AKA") 42 U.S.C. §1320a-7b(b), makes it illegal to:

> *Offer,* receive, or solicit *any remuneration*, kickback, bribe, or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in order *to induce such people to purchase*, lease, or order, or to arrange for or recommend the purchasing, leasing, or ordering of *any good, service, or item for which payment may be made in whole or in part under a Federal Health Care Program.*

77.    The AKA has certain safe harbors as set forth below. As seen from the requirements, Agendia's programs, as implemented, designed and executed, have not qualified for any safe harbor treatment.

---

[1]    1 31 U.S.C. § 3729.

78.     One safe harbor, (d) <u>Personal services and management</u>

<u>contracts</u>, states as follows:

(1)     As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following standards are met:

(i)     The agency agreement is set out in writing and signed by the parties.

(ii)    The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(iii)   The term of the agreement is not less than 1 year.

(iv)    The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(v)     The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(vi)    The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

Despite the strict requirements, Agendia's methodology for determining the $1,000

per month payments under the RTF contracts was not consistent with fair market

value in arm's-length transactions. In fact, the compensation was determined in a manner to induce the volume or value of any referrals or business otherwise generated between the parties to increase.

79.     Another safe harbor,  (f) <u>Referral services</u>, states as follows:

As used in section 1128B of the Act, "remuneration" does not include any payment or exchange of anything of value between an individual or entity ("participant") and another entity serving as a referral service ("referral service"), as long as all of the following four standards are met:

(1)     The referral service does not exclude as a participant in the referral service any individual or entity who meets the qualifications for participation.

(2)     Any payment the participant makes to the referral service is assessed equally against and collected equally from all participants and is based only on the cost of operating the referral service, and not on the volume or value of any referrals to or business otherwise generated by either party for the other party for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(3)     The referral service imposes no requirements on the manner in which the participant provides services to a referred person, except that the referral service may require that the participant charge the person referred at the same rate as it charges other persons not referred by the referral service, or that these services be furnished free of charge or at reduced charge.

(4)     The referral service makes the following five disclosures to each person seeking a referral, with each such disclosure maintained by the referral service in a written record certifying such disclosure and signed by either such person seeking a referral or by the individual making the disclosure on behalf of the referral service —

(i)     The manner in which it selects the group of participants in the referral service to which it could make a referral;

-24-

(ii)     Whether the participant has paid a fee to the referral service;

(iii)    The manner in which it selects a particular participant from this group for that person;

(iv)     The nature of the relationship between the referral service and the group of participants to whom it could make the referral; and

(v)      The nature of any restrictions that would exclude such an individual or entity from continuing as a participant.

Despite the strict requirements, Agendia's promotion and sales methodology, including the $1,000 per month payments under the RTF contracts, was not consistent with fair market value in arm's-length transactions, was not disclosed and did not otherwise meet the strict requirements of this safe harbor. In fact, the compensation and inducements were determined in a manner to induce the volume or value of any referrals or business otherwise generated between the parties to increase.

80.     Another safe harbor,  (s) <u>Referral arrangements for specialty services</u> states as follows:

As used in section 1128B of the Act, "remuneration" does not include any exchange of value among individuals and entities where one party agrees to refer a patient to the other party for the provision of a specialty service payable in whole or in part under Medicare, Medicaid or any other Federal health care programs in return for an agreement on the part of the other party to refer that patient back at a mutually agreed upon time or circumstance as long as the following four standards are met —

(1)      The mutually agreed upon time or circumstance for referring the patient back to the originating individual or entity is clinically appropriate.

-25-

(2)    The service for which the referral is made is not within the medical expertise of the referring individual or entity, but is within the special expertise of the other party receiving the referral.

(3)    The parties receive no payment from each other for the referral and do not share or split a global fee from any Federal health care program in connection with the referred patient.

(4)    Unless both parties belong to the same group practice as defined in paragraph (p) of this section, the only exchange of value between the parties is the remuneration the parties receive directly from third-party payors or the patient compensating the parties for the services they each have furnished to the patient.

Despite the strict requirements, Agendia's promotion and sales methodology, including the $1,000 per month payments under the RTF contracts was not consistent or otherwise meet the strict requirements of this safe harbor. In fact the compensation and inducements were determined in a manner to induce the volume or value of any referrals or business otherwise generated between the parties to increase.

B.    Billing for Medically Unnecessary Services

1.    The Medicare Standard for Reasonable and Necessary

81.    The Medicare statute expressly provides that services will not be reimbursed unless they are "*reasonable and necessary*," 42 U.S.C. § 1395y(a)(1)(A). Thus, a certification of necessity is at least implied in claims for reimbursement under that statute and expressly required through the CMS Provider Agreement.[2]

---

[2]    Agendia have entered into a Supplier Provider Agreement CMS-460. The Provider Agreement identifies compliance with the Anti–Kickback Statute as a "requirement that the provider must meet and maintain in order to bill the Medicare program."

82.    CMS has issued manuals explaining that services are *"reasonable and necessary"* if they are *"safe and effective," "not experimental or investigational,"* and *"appropriate"*— including because they are *"[f]urnished in accordance with acceptable standards of medical practice for the diagnosis or treatment of the beneficiary's condition."* Medicare Program Integrity Manual (MPIM) § 13.5.1; *see also* Medicare Benefit Policy Manual § 15.50.4.3 (explaining that "reasonable and necessary" determinations are made "with reference to acceptable standards of medical practice").[3]

83.    The Department of Health and Human Services' adjudications explain that "the relevant tests for applying these terms are whether  the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used." *See In the Case of Bionicare Med. Techs., Inc.*, No. M-09-415, 2010 WL 2994377, at *3 (H.H.S. Mar. 17, 2010) (citing 54 Fed. Reg. 4301 (1989); 60 Fed. Reg. 48417 (1995); 52 Fed. Reg. 15560.

84.    The "reasonable and necessary" test for *"acceptable standards of medical practice for the diagnosis or treatment of the beneficiary's condition"* also requires the service to be furnished in a setting appropriate to the patient's medical needs and condition, ordered and furnished by qualified personnel, and one that meets, but does not exceed, the patient's medical need. Medicare Claims Processing Manual, Chapter 16, § 90.1.

---

[3]    These standards apply whenever there is no National Coverage Determination ("NCD") in place. They govern both Local Coverage Determinations ("LCDs") and individual claim adjudications. *Almy v.Sebelius*, 679 F.3d 297, 304 (4th Cir. 2012) (citing MPIM § 13.3).

85.     In assessing whether the services are "*reasonable and necessary*" in the context of whether they are "*[f]urnished in accordance with acceptable standards of medical practice for the diagnosis or treatment of the beneficiary's condition*, the Current Procedural Terminology ("CPT") code set is maintained by the American Medical Association through the CPT Editorial Panel.

86.     The CPT code set accurately describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes the clinical indications that make the service reasonable and necessary. The current version is the CPT 2020.  The CPT code set is also known as the HCPCS Level I codes for Medicare/Medicaid purposes.

87.     While physicians must be able to order any tests, including screening tests, that they believe are appropriate for the treatment of their patients, according to the OIG, "*...Medicare will only pay for tests that meet the Medicare definition of 'medical necessity' and... may deny payment for a test that the physician believes is appropriate, such as a screening test, but which does not meet the Medicare definition of medical necessity.*[4] *The laboratories themselves are in a unique position to deliver this information to their physician clients.*"[5]

---

[4]     A printed statement should appear on every requisition form reiterating that when ordering tests for which Medicare reimbursement will be sought, physicians (or other individuals authorized by law to order tests ) should only order tests that are medically necessary for the diagnosis or treatment of a patient, rather than for screening purposes.

[5]     OIG Model Compliance Plan ("OIG Plan").

### V.    Agendia's Violation of The False Claims Act

A.    The False Claims Act

1.    The FCA And False Certification

88.    The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968). Relators allege that Agendia violated the FCA by causing the submission of false claims[6] in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

89.    A false certification (express or implied) establishes the "falsity" of a claim under the FCA. This was emphasized by Congress in the 1986 Amendments to the FCA stating "each and every claim submitted under a contract, loan guarantee or other agreement which was originally obtained by means of false statements or other corrupt and fraudulent conduct, or in violation of any statute or appropriate regulation, constitutes a false claim." S.Rep. No. 99-345 at 9 (1986), reprinted in 1986 U.S.C.C.A.M. 5266, 5274.

90.    Section 3729(a)(1)(A) requires only that a claimant present a 'false or fraudulent claim for payment or approval' without the additional element of a 'false

---

[6]    The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

record or statement.' Id. Thus § 3729(a)(1)(A) allows a relator to bring a claim based on a defendant submitting a claim for government funds without explicitly making a false statement.

91.    The FCA, 31 U.S.C. § 3729(a)(1)(B) makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

92.    A legally false FCA claim is based on a 'false certification' theory of liability." Id. A claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation which is material to the government's decision whether to make payment for the goods or services.

93.    Within the theory of false certification, there are two further categories: express and implied false certification. A defendant violates the FCA under express false certification when, in conjunction with a request for Federal funds, it certifies that it is in compliance with regulations that are requirements for payment.

94.    Last, the Medicare statute expressly provides that services will not be reimbursed unless they are "*reasonable and necessary*," 42 U.S.C. § 1395y(a)(1)(A).

Thus, a certification of necessity is at least implied in claims for reimbursement under that statute and expressly required through the CMS 855A Provider Agreement

2.    Factors to Consider in Materiality "Natural Tendency Test"

95.    The Supreme Court, in *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989 (U.S. 2016) reaffirmed that the proper test for determining materiality in FCA cases is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 136 S. Ct. at 2002 (citing 31 U.S.C. § 3729(b)(4); *Neder v. United States,* 527 U.S. 1, 16 (1999); *Kungys v. United States,* 485 U.S. 759, 770 (1988)). This approach is consistent with the statutory text of the FCA, which was amended in 2009 to expressly incorporate the "natural tendency" test, thereby rejecting a more onerous "outcome materiality" standard that some courts had adopted. *See* Pub. L. No. 111-21 at § 4 (2009) (The Fraud Enforcement and Recovery Act of 2009 ("FERA")).

96.    The Supreme Court in *Escobar* identified a variety of factors bearing on this holistic assessment, including whether:

- whether the requirement violated is a condition of payment,

- whether the requirement violated is significant or "minor or insubstantial,"

- whether the violation goes to the "'essence of the bargain,'" and

- how the Government has treated similar violations when it had "actual knowledge" of them.

-31-

### 3.    The FCA's Broad Definition of "Knowingly"

97.    "Knowingly" means the defendant (1) had actual knowledge that the claim is false; or (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim. 31 U.S.C. §§ 3729(b)(1)(A)(1-3), 2729(b)(1)(B).

98.    The FCA, 31 U.S.C. § 3729(a)(1)(A) makes "knowingly"[7] presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.[8]

### VI.    Agendia's Illegal Retaliation Against Relator

99.    During Relator's employment with Agendia, Relator complained on one or more occasions that certain conduct of Agendia was illegal, including arranging for physicians to use Agendia's products by cash payments to them or their staffs and allowing non-physicians to order genomic assays tests using Agendia's

---

[7]    "Knowingly" means the defendant (1) had actual knowledge that the claim is false; (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim. 31 U.S.C. §§ 3729(b)(1)(A)(1-3), 2729(b)(1)(B).

[8]    On November 2, 2015, President Obama signed into law the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (the 2015 Act), which further amended the Federal Civil Penalties Inflation Adjustment Act of 1990. The 2015 Act updates the process by which federal agencies adjust applicable civil monetary penalties for inflation to retain the deterrent effect of those penalties. The 2015 Act requires that not later than July 1, 2016, and not later than January 15 of every year thereafter, the head of each agency must, by regulation published in the Federal Register, adjust each CMP within its jurisdiction by the inflation adjustment described in the 2015 Act. For violations of the False Claims Act, the interim final rule minimum per-claim CMP's will increase to $10,781 from $5,500, and maximum per-claim CMPs will jump to $21,563 from $11,000. The increase takes effect August 1, 2015 and applies to violations after November2, 2015.

-32-

products. Notwithstanding, Agendia attempted to procure, by demand, Plaintiffs execution of a statement proffered to him by Agendia wrongfully accusing him of fraud. Relator complained of such demand, and other harassing dements, in writing on August 4, 2022.

100. After Relator made complaints to Agendia of the kind referred to in paragraph 102, Relator was threatened, harassed and otherwise subjected to discrimination in the terms and conditions of his employment with Agendia. Relator's employment with Agendia was terminated by notice on August 5, 2022. After terminating Relator, Agendia further failed to offer him a severance and accord him other post termination benefits to which he was entitled, as further described in paragraph 138. All such retaliation occurred after and because Relator engaged in lawful acts in furtherance of an action under Section 3730(h) of the FCA or other efforts to stop one or more violation of the FCA.

## VII.   Cause of Actions

A.   COUNT ONE

### THE FCA: 31 U.S.C. § 3729(a)(1)(A)

101. The allegations of paragraphs 1 -100 are incorporated herein as if more fully set forth at length.

102. The FCA, 31 U.S.C. § 3729(a)(1)(A) makes "knowingly"[9] presenting or

---

[9] Count three being against DRL and DRLUS only paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(1) of the FCA; that in the event any State intervenes in this action and takes over its prosecution, the Relators be awarded an amount for bringing this action for that respective State equal to a percentage of the proceeds paid to that State resulting from the trial or settlement of the claim, pursuant to the applicable provision of that State

causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of damages the government sustains and a civil monetary penalty of between $10,781 and $21,563 per claim.

103.    The false statements contained by Agendia were subject to the express certification made by Agendia in the submissions as well as CMS Form 885A and CMS Form 1500.

B.    COUNT TWO

THE FCA: 31 U.S.C. § 3729(a)(1)(B)

104.    The allegations of paragraphs 1 -100 are incorporated herein as if more fully set forth at length.

105.    The FCA, 31 U.S.C. § 3729(a)(1)(B) makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $10,781.00 and $21,563.00.

106.    The false statements contained in Agendia's submission of claims each constituted a false record.

---

FCA.

C.    <u>COUNT THREE</u>

<u>Violations of the Texas FCA</u>

107.    The allegations of paragraphs 1 – 103 are incorporated herein as more fully set forth at length.

108.    Agendia violated the following provisions of the Texas FCA, Chapter 36 of the Texas Government Code:

a.    Section 36.002(4), which prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program;

b.    Section 36.002(5), which prohibits a person, except as authorized under the Medicaid program, from knowingly paying, charging, soliciting, accepting or receiving, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program; and

c.    Section 36.002(9), which prohibits a person from knowingly entering into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized

payment or benefit from the Medicaid program or a fiscal agent. Agendia thereby caused claims for payment to be presented to the State of Texas for MP/BP tests as set forth herein which were knowingly false because Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

D.    COUNT FOUR

1.    Violations of the California FCA by Agendia

109.    Agendia violated the California FCA in the following respect:

a.    California Government Code §12651(a)(1) prohibits a person from knowingly presenting or causing to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

110.    California Health & Safety Code § 111440 entitled " Manufacture, sale, delivery, or holding of misbranded drug or device," states that "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded". Pursuant to Cal. Health & Safety Code § 108700, the State of California adopted the regulations under the CPSIA and PPPA.

111.    Agendia caused claims for payment to be presented to the State of California for MP/BP Tests as set forth herein which were knowingly false

-36-

because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

E.  COUNT FIVE

Violations of the Georgia FCA by Agendia

112.  Agendia violated the Georgia FCA in the following respect:

a.  Agendia violated O.C.G.A. §49-4-168.1(a)(1) by knowingly presenting or causing to be presented to an officer or employee of the State of Georgia a false or fraudulent claim for payment or approval.

113.  Agendia caused claims for payment to be presented to the State of Georgia for MP/BP Tests as set forth herein which were knowingly false because Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

F.  COUNT SIX

Violations of the Illinois FCA by Agendia

114.  Agendia violated the Illinois FCA in the following respect:

a.  Agendia violated 740 ILCS 175/3(a)(1)(A) by knowingly presenting or causing to be presented to an officer or employee of the State of Illinois a false or fraudulent claim for payment or approval.

115.   Agendia caused claims for payment to be presented to the State of Illinois for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations  were in compliance with federal and state laws

G.     COUNT SEVEN

Violations of the Michigan FCA by Agendia

116.   Agendia violated the Michigan FCA in the following respect:

a.     Agendia violated MCL 400.607(1) by knowingly presenting or causing to be presented to an officer or employee of the State of Michigan a claim under the social welfare act, upon or against the state, knowing the claim to be false.

117.   Agendia caused claims for payment to be presented to the State of Michigan for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations  were in compliance with federal and state laws.

H.    COUNT EIGHT

Violations of the New Jersey FCA by Agendia

118.    Agendia  violated the New Jersey FCA in the following respect:

a.    violated the New Jersey FCA §2A:32C-3a by knowingly presenting or causing to be presented to an officer or employee or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval.

119.    Agendia caused claims for payment to be presented to the State of New Jersey for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and  made express representations  were in compliance with federal and state laws.

I.    COUNT NINE

Violations of the New Mexico FCA by Agendia

120.    Agendia violated the New Mexico FCA in the following respect:

a.    violated NMSA §27-14-4A by presenting or causing to be presented to the state a claim for payment under the Medicaid program knowing that such claim is.  Agendia caused claims for payment to be presented to the State of New Mexico for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance federal and state requirements which was material and a substantial factor to the

government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws. false or fraudulent.

J.   COUNT TEN

### Violations of the Oklahoma FCA by Agendia

121.   Agendia violated the Oklahoma FCA in the following respect:

a.   Agendia violated Okla. Stat. §63-5053.1(B)(1) by knowingly presenting or causing to be presented to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval.

122.   Agendia caused claims for payment to be presented to the State of Oklahoma for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

K.   COUNT ELEVEN

### Violations of the Rhode Island FCA by Agendia

123.   Agendia violated the Rhode Island FCA in the following respect:

a.   Agendia violated R.I. Gen. Laws § 9-1.1-3(a)(1) by knowingly presenting or causing to be presented to an officer or employee of the state or member of the guard a false or fraudulent claim for payment or approval.

124.    Agendia caused claims for payment to be presented to the State of Rhode Island for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

L.    COUNT TWELVE

Violations of the Tennessee FCA by Agendia

125.    Agendia violated the Tennessee FCA in the following respect:

a.    Agendia violated Tenn. Code Ann. §71-5-181(a)(1)(A) by presenting or causing to be presented to the state a claim under the Medicaid program knowing such claim is false or fraudulent.

126.    Agendia caused claims for payment to be presented to the State of Tennessee for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the Government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

_____

M.    COUNT THIRTEEN

Violations of the Wisconsin FCA by Agendia

127.    Agendia violated the Wisconsin FCA in the following respect:

a.    Agendia violated Wis. Stat. §20.931(2)(a) by knowingly presenting or causing to be presented to an officer, employee, or agent of the state a false claim for medical assistance.

128.    Agendia caused claims for payment to be presented to the State of Wisconsin for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

N.    COUNT FOURTEEN

Violations of the Virginia FCA by Agendia

129.    Agendia violated the Virginia FCA in the following respect:

a.    Agendia violated Code of Virginia § 8.01-216.3A(1) by knowingly presenting, or causing to be presented, to an officer or employee of the Commonwealth a false claim for payment or approval.

130.    Agendia caused claims for payment to be presented to the State of Virginia for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the

government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

O.    COUNT FIFTEEN

Violations of the Washington FCA by Defendant

131.    Agendia violated the Washington Medicaid Fraud False Claims Act, WASH. SESS. LAWS, LAWS OF 2012, ch. 241 §§ 201 through 214 ("Washington FCA") in the following respect:

a.    Agendia violated the Washington FCA, by knowingly presenting, or causing to be presented, to an official or employee of the state a false or fraudulent claim for payment or approval.

132.    Agendia caused claims for payment to be presented to the state of Washington for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

P.    COUNT SIXTEEN

Violations of the Colorado FCA by Defendant

133.    Agendia violated the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 through 25.5-4-310 ("Colorado FCA") in the following respect:

a.    Agendia violated, by knowingly presenting, or causing to be presented, to an official or employee of the State a false or fraudulent claim for payment or approval.

134.    Agendia caused claims for payment to be presented to the State of Colorado for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

Q.    COUNT SEVENTEEN

Violations of the Iowa FCA by Defendant

135.    Agendia violated the Iowa False Claims Act ("Iowa FCA") Iowa Code §§ 685.1 through 685.7 in the following respect:

a.    Agendia violated Iowa FCA, by knowingly presenting, or causing to be presented, to an official or employee of the State of Iowa a false or fraudulent claim for payment or approval.

136.    Agendia caused claims for payment to be presented to the State of Iowa for MP/BP Tests as set forth herein which were knowingly false because they Agendia made an implied certification that they were in compliance with federal and state requirements which was material and a substantial factor to the government's decision to make payment and a condition of such payment, and made express representations were in compliance with federal and state laws.

R.    COUNT EIGHTEEN

### Violation of Section 3730(h) of the FCA by Agendia

137.    For cause of action, Relator would show that he was subjected by Defendant to a violation of Section 3730(h)(1) of the FCA and entitled to the relief provided for in Section 3730(h)(2) of the FCA. Relator is accordingly entitled to recover from Defendant all actual damages, special damages, prejudgment interest, attorney's fees and cost of court.

S.    COUNT NINETEEN

### Breach of Contract

138.    For cause of action, Relator would show that he was subjected by Agendia to a breach of contract by being denied the severance and prior year bonus and equity acceleration in connection with his termination provided for in paragraph 3(b)(i)(ii) and (iv) of his Employment Agreement dated December 20, 2021. Relator is accordingly entitled to recovery from Defendant all actual damages, prejudgment interest, attorney's fees and costs of court.

T.    RELIEF REQUESTED

Relators request the following relief be imposed against Agendia as it relates to each of the Counts set forth herein:

(a)    That the United States be awarded three times the amount of damages which it sustained because of the acts of Agendia pursuant to §3729(a)(1) of the FCA under Counts One (1) and Two[28] (3); that the States of California, Georgia, Illinois, Michigan, New Jersey, New Mexico, Oklahoma, Rhode Island, Tennessee, Wisconsin, Washington, Colorado and Iowa and the Commonwealth of Virginia, be awarded three times the amount of any payments provided under their Medicaid programs as a result of Agendia' unlawful acts, pursuant to the respective provision of each State FCA under Counts Four (4) through Seventeen;

(b)    That Agendia be held liable for civil penalties of up to $10,000.00, but not less than $5,000.00 (as adjusted pursuant to §3729 of the FCA), to the U.S. for each and every act in violation of the FCA; that Agendia each be held liable for civil penalties applicable for each and every unlawful act in violation of each respective State FCA;

(c)    That this Court award such interest as is available pursuant to the FCA and/or each State FCA;

(d)    That in the event the United States intervenes in this action and takes over its prosecution, the Relators be awarded an amount for bringing this action on behalf of the United States of at least 15% but not more than 25% of the proceeds.

-46-

(e)    That in the event the United States does not intervene in this action, the Relators be awarded an amount for bringing this action for the United States of at least 25% but not more than 30% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(2) of the FCA; that in the event a state does not intervene in this action, the Relators be awarded an amount for bringing this action for each respective state equal to a percentage of the proceeds paid to that state resulting from the trial or settlement of the claim, pursuant to the applicable provision of that state's FCA;

(f)    That this Court award order reinstatement with the same seniority status with Agendia that Relator would have had but for Agendia's violation of Section 3730(h) of the FCA, and award Relator two times the amount of back pay, prejudgment interest on the back pay, compensation for special damages, including litigation costs and reasonable attorneys' fees, and costs of court to the Relators, pursuant to §3730(h)of the FCA;

(g)    That this Court award Relator all actual damages, prejudgment interest, attorney's fees and costs of court on his claim of breach of contract;

(h)    That this Court award reasonable attorneys' fees, costs and expenses to the Relators, which were necessarily incurred in bringing and prosecuting this case, pursuant to §3730(d)(1) or (2) of the FCA and each respective State FCA; and

(i)    That this Court award such other relief as it deems just, necessary and fair.

JURY DEMAND

Relators requests a trial by jury of all issues so triable.

Respectfully submitted,

Kilgore & Kilgore, PLLC

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.,
Texas Bar No. 08158100
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 379-0823
Email: reg@kilgorelaw.com

Begelman & Orlow, PC

/s/ Marc M. Orlow
/s/ Ross Begelman
Marc M. Orlow
Ross Begelman
Begelman & Orlow, PC
411 Route 70 East, Suite 245
Cherry Hill, New Jersey 08034
(856) 428-6020
Email: marc.orlow@begelmanorlow.com
Email: ross.begelman@begelmanorlow.com

COUNSEL FOR PLAINTIFF/RELATOR

# EXHIBIT
# A



# AGENDIA
## PRECISION ONCOLOGY

## PATHOLOGY SPECIMEN RETRIEVAL AND TRANSPORT AGREEMENT

Name: ▓▓▓Whitney Lynn Cornelison▓▓▓

Phone: ▓▓479-582-1060▓▓

Address: ▓▓5501 Bryant Place▓▓

City, St, Zip: ▓▓Springdale AR 72764▓▓    Date: ▓▓12/29/20▓▓

---

**Description**
This Pathology Specimen Retrieval and Transport Agreement ("Agreement") between Agendia, Inc. ("Agendia") and ▓▓Whitney Lynn Cornelison▓▓ ("Contractor").

**Background:**
"Time to Treat" in the preoperative setting has become a major focus in early stage breast cancer. To ensure genomic results are available at the time of initial surgical consult, Agendia testing turnaround time should not exceed seven (7) days from the time of order. The purpose of this Agreement is to enhance the quality of care for breast cancer patients by reducing the time between when an order is placed and when the specimen is pulled and packaged for Agendia send out.

**Scope of Work**
To ensure results are delivered in an expeditious manner, Agendia will retain Contractor as an independent contractor to perform the following laboratory services: (i) patient sample retrieval, (ii) order form completion, and (iii) specimen transport services (the "Services").

**Contractor Representation**
Contractor warrants and represents to Agendia that Contractor does not, and is not in a position to, recommend, arrange for or otherwise influence any physician to order or request genomic testing from Agendia.

**Compensation**
Agendia will compensate Contractor in the amount of ▓▓$1,000.00▓▓ Dollars USD each month for the Services at ▓▓Breast Treatment Associates▓▓ facility. These samples will shipped to Agendia for the purposes of providing diagnostic services.

**Return of Specimen**
Agendia will return all tissue blocks and/or slides requested by Contractor after reporting of the results unless otherwise specified by Contractor.

5899783.2

AGENDIA NV  |  Science Park 406  |  1098 XH Amsterdam  |  The Netherlands  |  Phone: +31 20 4621510  |  Fax +31 20 4621505
AGENDIA, INC.  |  22 Morgan  |  Irvine  |  California 92618  |  United States  |  Phone: + 1 888.321.2732  |  Fax: +1 888.756.7548
Info@agendia.com  |  Agendia.com

Jason Hamm
Plaintiff Documents 00003



## AGENDIA
PRECISION ONCOLOGY

## PATHOLOGY RETRIEVAL AND TRANSPORT AGREEMENT

AGREED TO AND ACCEPTED this ▓▓▓ day of ▓▓▓▓▓▓▓, 2019

Print: Whitney Cornelison    Title: Registered Nurse

Signature: _____

Agendia    Print: _____    Title: _____

Agendia    Signature: _____

AGENDIA NV  |  Science Park 406  |  1098 XH Amsterdam  |  The Netherlands  |  Phone:  +31 20 4621510  |  Fax +31 20 4621505
AGENDIA, INC.  |  22 Morgan  |  Irvine  |  California  92618  |  United States  |  Phone: + 1 888.321.2732  |  Fax: +1 888.756.7548
info@agendia.com  |  Agendia.com

Jason Hamm
Plaintiff Documents 00004

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification**<br><br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | Give Form to the<br>requester. Do not<br>send to the IRS. |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Whitney Cornelison

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☑ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.   Requester's name and address (optional)

5501 Bryant Pl.

**6** City, state, and ZIP code

Springdale, AR, 72764

**7** List account number(s) here (optional)

**Print or type.**
**See Specific Instructions on page 3.**

| **Part I** | **Taxpayer Identification Number (TIN)** |

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

4 3 0 - 7 9 - 8 4 3 2

or

**Employer identification number**

☐ ☐ ☐ - ☐ ☐ ☐ ☐ ☐ ☐ ☐

| **Part II** | **Certification** |

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign<br>Here | Signature of<br>U.S. person ▶ | *[signature]* | Date ▶ 12-19-19 |

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Jason Hamm
Plaintiff Documents 00005



**AGENDIA**
PRECISION ONCOLOGY

## ACH INSTRUCTIONS

Date: 12-19-19

Contact Name: Whitney Cornelison

Contact Phone #: 479-422-5371

Signature: [signature]

### 1. Beneficiary Account Information

***Account Name: Joint checking

***Account Number: 0064025037

Address 1: 5501 Bryant Pl.

Address 2: Springdale, AR 72764

Address 3:

### 2. Beneficiary Bank Information

***Bank Name: Arvest

***ABA (ACH) Bank ID: 082900872

Address 1: PO Box 799

Address 2: Lowell, AR 72745

Address 3:

***Denotes required fields

22 Morgan | Irvine | CA 92618 | p: 949.540.6300 | f: 888.435.0146
financehelpus@agendia.com | www.agendia.com

Jason Hamm
Plaintiff Documents 00006

# EXHIBIT

# B



# AGENDIA
### PRECISION ONCOLOGY

## PATHOLOGY SPECIMEN RETRIEVAL
## AND TRANSPORT AGREEMENT

Name: Victoria Peterson

Phone: 417-399-7554

Account Address: 820 N. Albany

City, St, Zip: Bolivar, Mo, 65613          Date: 8/31/2020

---

**Description**
This Pathology Specimen Retrieval and Transport Agreement ("**Agreement**") between Agendia, Inc. ("**Agendia**") and Victoria Peterson ("**Contractor**").

**Background:**
"Time to Treat" in the preoperative setting has become a major focus in early stage breast cancer. To ensure genomic results are available at the time of initial surgical consult, Agendia testing turnaround time should not exceed seven (7) days from the time of order. The purpose of this Agreement is to enhance the quality of care for breast cancer patients by reducing the time between when an order is placed and when the specimen is pulled and packaged for Agendia send out.

**Scope of Work**
To ensure results are delivered in an expeditious manner, Agendia will retain Contractor as an independent contractor to perform the following laboratory services: (i) patient sample retrieval, (ii) order form completion, and (iii) specimen transport services (the "**Services**").

**Contractor Representation**
Contractor warrants and represents to Agendia that Contractor does not, and is not in a position to, recommend, arrange for or otherwise influence any physician to order or request genomic testing from Agendia.

**Compensation**
Agendia will compensate Contractor in the amount of 1,000 Dollars USD each month for the Services at Central Care Cancer Center – Bolivar facility. These samples will shipped to Agendia for the purposes of providing diagnostic services.

**Return of Specimen**
Agendia will return all tissue blocks and/or slides requested by Contractor after reporting of the results unless otherwise specified by Contractor.

5899783.2

AGENDIA NV  |  Science Park 406  |  1098 XH Amsterdam  |  The Netherlands  |  Phone: +31 20 4621510  |  Fax +31 20 4621505
AGENDIA, INC.  |  22 Morgan  |  Irvine  |  California 92618  |  United States  |  Phone. + 1 888.321.2732  |  Fax +1 888.756.7548
info@agendia.com  |  Agendia.com

Jason Hamm
Plaintiff Documents 00007



**AGENDIA**
PRECISION ONCOLOGY

## PATHOLOGY RETRIEVAL AND TRANSPORT AGREEMENT

**Term**
This Agreement will commence on ▓9/1▓ ▓▓▓▓, 2020 ("Commencement Date") and will remain in force for one year. Upon expiration of such initial term, this Agreement shall automatically renew for additional one year terms unless either party notifies the other party of its intent not to renew. This Agreement can be terminated at any time for no reason or any reason by either party upon thirty (30) days prior written notice to the other party.

**Payment Terms**
Contractor will send invoices to Agendia on a monthly basis for verification and payment. All undisputed invoices will be paid by Agendia within thirty (30) days of receipt of the invoice. Invoices should be sent to:

**Agendia, Inc.**
**Attn: Accounts Payable**
**22 Morgan**
**Irvine, CA 92618**

**Confidentiality and Compliance**
Neither Agendia nor Contractor shall disclose the substance of this Agreement or any confidential, proprietary and/or non-public information acquired from the other party during the course of or pursuant to this Agreement to any third party unless required by law or authorized in writing from the other party (provided that the receiving party first notifies the disclosing party of such a request). These obligations shall survive the expiration or earlier termination of this Agreement.

Both parties shall comply with the privacy provisions of the regulations implementing the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Each party represents and warrants that it is not now, nor has it ever been sanctioned, debarred, suspended, or excluded from participation in any federally or state funded health care program, including without limitation Medicare, Medicaid or California Medi-Cal.

The parties agree that the payments made hereunder by Agendia are reasonable compensation for identifiable services, consistent with fair market value, and have not been determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals between the parties. The parties intend to comply with all applicable federal and state laws, rules and regulations and nothing contained herein nor any other agreement between the parties, nor any consideration offered or paid in connection with this Agreement, contemplates or requires the referral of any business. In the event that any governmental agency, court of any other judicial body of competent jurisdiction, as applicable, issues an opinion, ruling or decision that any payment, fee or consideration provided for hereunder is made or given for referrals, either party may immediately terminate this Agreement.

This Agreement constitutes the entire understanding between Contractor and Agendia regarding the Services and supersedes all prior understandings, arrangements and agreements between Contractor and Agendia specifically relating to pathology collection and handling fee agreements.

Each duly authorized representative of the parties shall indicate their acknowledgement and acceptance of this Agreement as of the Effective Date by signing where indicated below.

AGENDIA NV | Science Park 406 | 1098 XH Amsterdam | The Netherlands | Phone: +31 20 4621510 | Fax +31 20 4621505
AGENDIA, INC. | 22 Morgan | Irvine | California 92618 | United States | Phone. + 1 888.321.2732 | Fax: +1 888.756.7548
info@agendia.com | Agendia.com

Jason Hamm
Plaintiff Documents 00008



## AGENDIA
PRECISION ONCOLOGY

## PATHOLOGY RETRIEVAL AND TRANSPORT AGREEMENT

AGREED TO AND ACCEPTED this ___31___ day of ___August___, 2020

Print:__Victoria Peterson____    Title:_____

Signature:__Victoria Peterson_____

Agendia   Print:_____    Title:_____

Agendia   Signature:_____

AGENDIA NV  |  Science Park 406  |  1098 XH Amsterdam  |  The Netherlands  |  Phone: +31 20 4821510  |  Fax +31 20 4821505
AGENDIA, INC.  |  22 Morgan  |  Irvine  |  California 92618  |  United States  |  Phone: + 1 888.321.2732  |  Fax: +1 888.756.7548
info@agendia.com  |  Agendia.com

Jason Hamm
Plaintiff Documents 00009

# EXHIBIT C



# **AGENDIA**
PRECISION ONCOLOGY

## PATHOLOGY SPECIMEN RETRIEVAL
## AND TRANSPORT AGREEMENT

Name:  William Brock

Phone:

Account Address:

City, St, Zip:                                          Date:

---

**Description**
This Pathology Specimen Retrieval and Transport Agreement ("**Agreement**") between Agendia, Inc. ("**Agendia**") and _Will Brock ("**Contractor**").

**Background:**
"Time to Treat" in the preoperative setting has become a major focus in early stage breast cancer. To ensure genomic results are available at the time of initial surgical consult, Agendia testing turnaround time should not exceed seven (7) days from the time of order. The purpose of this Agreement is to enhance the quality of care for breast cancer patients by reducing the time between when an order is placed and when the specimen is pulled and packaged for Agendia send out.

**Scope of Work**
To ensure results are delivered in an expeditious manner, Agendia will retain Contractor as an independent contractor to perform the following laboratory services: (i) patient sample retrieval, (ii) order form completion, and (iii) specimen transport services (the "**Services**").

**Contractor Representation**
Contractor warrants and represents to Agendia that Contractor does not, and is not in a position to, recommend, arrange for or otherwise influence any physician to order or request genomic testing from Agendia.

**Compensation**
Agendia will compensate Contractor in the amount of      1,000     Dollars USD each month for the Services at _KCBC_____facility. These samples will shipped to Agendia for the purposes of providing diagnostic services.

**Return of Specimen**
Agendia will return all tissue blocks and/or slides requested by Contractor after reporting of the results unless otherwise specified by Contractor.

5899783.2

Jason Hamm
Plaintiff Documents 02186



# PATHOLOGY RETRIEVAL AND TRANSPORT AGREEMENT

**Term**
This Agreement will commence on    9/1/            , 2020 ("**Commencement Date**") and will remain in force for one year.  Upon expiration of such initial term, this Agreement shall automatically renew for additional one year terms unless either party notifies the other party of its intent not to renew. This Agreement can be terminated at any time for no reason or any reason by either party upon thirty (30) days prior written notice to the other party.

**Payment Terms**
Contractor will send invoices to Agendia on a monthly basis for verification and payment. All undisputed invoices will be paid by Agendia within thirty (30) days of receipt of the invoice. Invoices should be sent to:

**Agendia, Inc.**
**Attn: Accounts Payable**
**22 Morgan**
**Irvine, CA 92618**

**Confidentiality and Compliance**
Neither Agendia nor Contractor shall disclose the substance of this Agreement or any confidential, proprietary and/or non-public information acquired from the other party during the course of or pursuant to this Agreement to any third party unless required by law or authorized in writing from the other party (provided that the receiving party first notifies the disclosing party of such a request).  These obligations shall survive the expiration or earlier termination of this Agreement.

Both parties shall comply with the privacy provisions of the regulations implementing the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"). Each party represents and warrants that it is not now, nor has it ever been sanctioned, debarred, suspended, or excluded from participation in any federally or state funded health care program, including without limitation Medicare, Medicaid or California Medi-Cal.

The parties agree that the payments made hereunder by Agendia are reasonable compensation for identifiable services, consistent with fair market value, and have not been determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals between the parties. The parties intend to comply with all applicable federal and state laws, rules and regulations and nothing contained herein nor any other agreement between the parties, nor any consideration offered or paid in connection with this Agreement, contemplates or requires the referral of any business. In the event that any governmental agency, court of any other judicial body of competent jurisdiction, as applicable, issues an opinion, ruling or decision that any payment, fee or consideration provided for hereunder is made or given for referrals, either party may immediately terminate this Agreement.

This Agreement constitutes the entire understanding between Contractor and Agendia regarding the Services and supersedes all prior understandings, arrangements and agreements between Contractor and Agendia specifically relating to pathology collection and handling fee agreements.

Each duly authorized representative of the parties shall indicate their acknowledgement and acceptance of this Agreement as of the Effective Date by signing where indicated below.

AGENDIA NV    S              1090 XB Amsterdam   The Netherlands   Phone: +31 21 462      Fax +31 20 462 1505
AGENDIA, INC.                  California         United States    Phone: + 1 82      273     Fax: + 1 888        7518
info@agendia.com    Agendia.com

Jason Hamm
Plaintiff Documents 02187



# PATHOLOGY RETRIEVAL AND TRANSPORT AGREEMENT

AGREED TO AND ACCEPTED this      1      day of   August              , 2020

Print:_____   Title:_____

Signature:_____

Agendia    Print:_____   Title:_____

Agendia    Signature:_____

AGENDIA NV    Science Park 406    1098 XH Amsterdam | The Netherlands    Phone: +31 20 462 1515    Fax +31 20 462 1505

AGENDIA, INC.    22 Morgan    Irvine    California 92618    United States    Phone: +1 888 321 2732 | Fax +1 888 798 7648

info@agendia.com      Agendia.com

Jason Hamm
Plaintiff Documents 02188

# EXHIBIT
# D

| Specimen Collection/Retrieval Individuals | Known Affiliations | Account | MD | RD | MOS |
|---|---|---|---|---|---|
| | | The Breast Place | Jennifer Beatty | Marnie | Regina |
| | | Utah Surgical Associates | Jennifer Tittensor | Becky | Katherine |
| | | West Clinic | Ricky Fine | Tina | Jeff |
| Cancer Solutions | Cancer Solutions, LLC | ??? | ??? | ??? | ??? |
| Cheryl Duckett | Knoxville Comprehensive Breast Cancer Facility | Knoxville Comprehensive Breast Cancer Facility | Kamilla Kozlowski | Tina | Jeff |
| Courtney Prevatt | Regional Breast Care | Regional Breast Care | David Rock | Marnie | Miami - OPEN |
| Elise E. Garcia | Banner Health | ??? | ??? | Becky | Katie or Katherine |
| | | Advanced Srugical Care | Barry Rosen | Brian | Andrea |
| Haley Shook | Haley Shook | Birmingham Minimally Invasive Surgery | Jay Long | Tina | Alabama - OPEN |
| Jamie M Boyle | Jamie Boyle | Comprehensive Breast Center of AZ | Sommer Gunia | Becky | Katherine |
| Julie R. Needle | Denise Sanderson Breast Cancer Surgery | Denise Sanderson Breast Cancer Surgery | Denise Sanderson | Marnie | Miami - OPEN |
| Katina Stewart-Jones | Advent Health | Advent Health | | Marnie | Cherie |
| | | West Clinic | ??? | Tina | Jeff |
| | | Nashville Breast Center | Pat Whitworth | Tina | Jeff |
| Lavern Hager | Emory Hematology Oncology at Decatur | Emory Hematology Oncology at Decatur | David Shepard | Marnie | Jane |
| | | Monterey County Surgical Assoc | Michael Stuntz | Becky | Eddie |
| | | ??? | ??? | Tina | Jeff |
| Natalie Beilstein | USF | Tampa General | Abigail Beard | Marnie | Tampa |
| Robin R Shierling | Advent Health Medcial Group | AdventHealth Breast Care | Paul Williams | Marnie | Cherie |
| Ruth Janet Reyes | TGH | Tampa General | Cox?? | Marnie | Tampa |
| Shanna Bacon Lynn | The Breast Place | The Breast Place | Jennifer Beatty | Marnie | Regina |
| | | Valeria Traina, MD | Valerie Traina | Becky | Eddie |
| Stephanie Lee Lara | Stephanie L Lara | NCH Physician Group | Sharla Gayle Patterse | Marnie | Miami - OPEN |
| | | St. Mary's Hospital | Beth Seiling | Julie | Renea |
| | | Central Cancer Care Center Boilvar | Leonid Shunyakov | Tina | Jeff |
| Whitney Cornelison - AWARE | Breast Treatement Associates | Breast Treatement Associates | Michael Cross | Tina | Gregg |
| Yana Masouras | Paradise Coast Breast Specialists | Paradise Coast Breast Specialists | Troy Shell | Marnie | Miami - OPEN |
| Desiree Legaspi | Surgical Associates of Lajolla | Surgical Associates of Lajolla | Cheryl Olson | Becky | Kat     * Surgeon needs to be on the call as well, De |
| Will Brock | Knoxville Comprehensive Breast Cancer Facility | *He says he's not under contract | | | |

JS 44   (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

**3-22-cv-2259 - E**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jason Hamm ex rel., United States of America, et al.

**DEFENDANTS**

Agendia, Inc. aka Agendia Medical

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Robert E. Goodman, Jr., 3141 Hood Street, Suite 500, Dallas, Texas 75219, 214-379-0823

Attorneys *(If Known)*

RECEIVED

OCT - 7 2022

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability / ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine / Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education / ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act 31 USC S 3729, 3730(h), (e)(4)(B) and 3730(b)(2).

Brief description of cause:
Defendants participated in acts in violation False Claims Act.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 10/07/2022 | /s/ Robert E. Goodman, Jr. |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____